THE ROBERT R. KIRKLAND.

(District Court, D. New Jersey. February 17, 1906.)

1. SHIPPING—OWNERSHIP OF VESSEL—EVIDENCE CONSIDERED.
    Evidence considered, and held not to sustain the claim of a respondent to the ownership of a vessel in controversy.

2. MARITIME LIEN—REPAIRS—RIGHT TO CONTRACT FOR.
    One of the respondents and another person were appointed agents to represent a number of parties who had joined in the purchase of the plant and vessels of a dredging company to be paid for in installments, with power to make the payments and receive and manage the property. The other respondent was a firm of which the first respondent was a member, and which was also one of the purchasers of the dredging property. Held, that the individual respondent had no power, as agent, to create a maritime lien for repairs in favor of the firm on one of the vessels purchased, and which had been delivered for the purchasers without the concurrence of his coagent, nor to create a lien for repairs thereon made at his own instance, under an unfounded claim of ownership in himself.

3. SHIPPING—SUIT TO RECOVER VESSEL—TITLE TO SUPPORT.
    The directors of a dredge owners' association, whose members had joined in the purchase of a dredging plant, appointed a committee, subject to the approval of the individual purchasers, to take title to the property purchased and manage and dispose of the same. Their action was ratified by the constituent members, and a. bill of sale of the property, including the tug in controversy, was made to the committee and duly recorded. Held, that the committee thus vested with the legal title was authorized to maintain a suit in their own names to recover possession of the tug from one of the constituent owners which withheld possession of it without right.

In Admiralty. Suit for possession of a vessel.

Albert A. Wray, for libelants.

R. D. Benedict, for respondents Ralph G. Packard and Josiah S. Packard.

LANNING, District Judge. By the libel filed in this case Henry H. Petze, Charles H. Souther, and Charles W. Pusey allege that they are the true and legal owners of the steam tug Robert R. Kirkland, and that it is wrongfully withheld from them by Ralph G. Packard and Josiah S. Packard, upon an alleged claim of ownership thereof, or of some interest therein by reason of repairs of the tug alleged to have been made by them. The prayer of the libel is for a decree adjudging that the tug be delivered by the Packards to the libelants, and for general relief.

Ralph G. Packard has answered the libel, denying the ownership of the libelants, or that the tug is wrongfully withheld from the libelants, admitting possession by the firm of R. G. & J. S. Packard (composed of himself and his brother, Josiah S. Packard), and declaring that said firm held possession at the time of the filing of the libel by reason of a lien for repairs made by the firm to the tug. The answer further sets forth that he is the owner of the tug and claims title to it by reason of the following facts: That on October 12, 1892, a written agreement was made between the National Dredging Company of Wilmington, Del., party of the first part, and certain other parties in the agreement named, as parties of the second part, whereby the National Dredging Company agreed to sell the tug, with other property, to the parties of the second part; that by that agreement the respondent Ralph G. Packard and Louis Y. Schermerhorn were appointed agents and representatives of the parties of the second part, with power to make payments and to receive the property so agreed to be sold and bills of sale thereof; that, in accordance with that agreement, the tug was delivered to Ralph G. Packard and Louis Y. Schermerhorn; that thereafter, by a later agreement, the libelants were substituted as such agents in the place of Ralph G. Packard and Louis Y. Schermerhorn; that the libelants wrongfully secured from the National Dredging Company a bill of sale for the tug made out to them absolutely, and not as agents of the parties of the second part; that the bill of sale was not recorded in the New York custom house until July 19, 1898; that the libelants never had possession of the tug or exercised any ownership thereof, either in their own right or as agents of the parties of the second part, and never paid anything individually for the tug; that in the bill of sale procured by them it was wrongfully stated that the tug was transferred to them for a valuable consideration paid by them; that in the month of February, 1898, the tug was sold by the real owners thereof to the respondent Ralph G. Packard for the sum of $1,600; that thereafter Ralph G. Packard had possession of the tug, exercised ownership over her, and made improvements upon her; and that, since such sale, he has been the true and lawful owner thereof, and that the libelants have had no interest whatever therein. Another answer was filed by the firm of R. G. & J. S. Packard, in which they say that they are partners in business, and were in pos-

session of the tug at the time of the filing of the libel by virtue of a lien for repairs and work done by them upon her. They deny that the libelants were, at the time of filing the libel, the true and legal owners of the tug, or that she has been wrongfully withheld from the libelants by the respondents.

It will be observed that the pleadings present three questions for consideration: First, is the respondent Ralph G. Packard the true owner of the tug? Second, if not, has the firm of R. G. & J. S. Packard a right to hold her under a lien for repairs? And, third, if the respondent Ralph G. Packard has failed to establish his ownership of the tug, and if R. G. & J. S. Packard have failed to establish their right to the possession of the tug under a lien for repairs, have the libelants shown a title which gives them the right to take her out of the possession of the firm of R. G. & J. S. Packard?

By the proofs in the case it appears that on October 12, 1892, a written agreement was entered into between the National Dredging Company, of the first part, and 24 corporations, firms, and individuals described, as parties of the second part, by which the party of the first part agreed to sell to the parties of the second part, with good and sufficient bills of sale, its dredging plant on the Atlantic Coast, consisting of "all the dredges, tug, scows and water-scows named in the schedule hereto annexed, marked 'A,' and all dredging machinery, power, tools, duplicate parts and appliances, located or designed for use in and about the vessels and craft aforesaid, and all like property of every name and description belonging to said party of the first part and used or designed for use by it in connection with any of its plant on said Atlantic Coast," for the sum of $125,000, payable in installments as follows: $25,000 on execution of the agreement; $25,000 on January 2, 1893; $18,750 on July 2, 1893; $18,750 on January 2, 1894; $18,750 on July 2, 1894; and $18,750 on January 2, 1895. Provision was also made in the agreement for extending the last four payments of $18,750 each to January 2, 1896, and that after the second installment of $25,000 should be paid the party of the first part would deliver any of the dredges, tugs, scows, or water scows to the parties of the second part, or their assigns, "upon the payment of an amount equal to the schedule price thereof." It was further provided:

"That at any time after the execution of this agreement the party of the first part may tender the care and custody of any of said vessels to the agents or representatives of the parties of the second part, and that thereupon said parties of the second part shall take the care and custody thereof and maintain and protect the same at their own expense and risk and in condition for delivery, until the same are delivered to them pursuant to the terms of this agreement, and the purchase price of such of the plant as is so tendered shall bear interest from date of tender to time of payment therefor."

It was also provided:

"That title to and possession of all of said dredges, tug, scows and water-scows, and appurtenances, are to remain in said party of the first part until the last of said payments, except that said parties of the second part or their assigns may be given possession of any of said vessels as herein provided."

It was also provided:

"That Ralph G. Packard of New York and Louis Y. Schermerhorn of Philadelphia shall be the agents and representatives of the parties of the second part herein, with power to change or modify the terms or times of payment and to make payments and receive and accept tenders or deliveries of said plant and of bills of sale therefor, and all notices, demands, or other communications for said party of the first part to said parties of the second part in reference to the premises may be given, made, and addressed to Messrs. Packard and Schermerhorn at 31 Pine Street, New York."

Annexed to the agreement was a schedule, in which it appears that there was but one tug, the Robert R. Kirkland, and that she was valued at $10,000. About April, 1893, the tug was delivered to Packard and Schermerhorn. I think the delivery was made about this time because Ralph G. Packard testifies that it was delivered to him and Schermerhorn some six months after October 12, 1892, and Mr. Schermerhorn says that after the delivery to Messrs. Packard and Schermerhorn she was used by them for a season at Philadelphia under the direction of the American Dredging Company. It appears, as will presently be seen, that she was sent from Philadelphia to New York in January, 1894. I think, therefore, the delivery to Packard and Schermerhorn must have been made in the spring, and probably in April, of the year 1893. Nor do I think the delivery to them was made for the mere purpose of care and custody in accordance with the provision of the contract of October 12, 1892, concerning delivery to the agents of the parties of the second part for care and custody. Mr. Packard himself testifies that he, as trustee, asked Mr. George D. Barker, president of the National Dredging Company, for the delivery of the tug and several scows and one of the dredges to the purchasers for their use and benefit in any way that the purchasers might desire, or for the purpose of selling when they should find a purchaser. And the fact that after the delivery she was used, as he says, for a whole season or more in towing at Philadelphia, not for the business of the National Dredging Company, but under the direction of the American Dredging Company for the benefit of the parties of the second part, makes it reasonably clear that the delivery in April, 1893, was not for care and custody, but that it was a delivery to the parties of the second part under the agreement of sale, with title reserved in the party of the first part until payment should be made. Finding no further use for the tug at Philadelphia after the close of the season of 1893, and desiring to sell her for the benefit of the parties of the second part, Schermerhorn, on January 6, 1894, wrote from Philadelphia to Ralph G. Packard, who was in New York, that the tug would be ready to send to New York (where they thought they could more readily find a purchaser) as soon as a broken wheel could be replaced and the safety valve repaired. She reached New York before January 17, 1894, and on that day William J. Bradley, general superintendent and chief engineer of the American Dredging Company, wrote a letter from Philadelphia to Ralph G. Packard, in New York, stating that the vessel had a good bottom and was all right under water; that her valves were in fair order, but that the joint on her low-pressure cylinder, her circulating pump, and her

house, should be repaired; and that she ought to be painted, but that he did not think anything else needed to be done. When the vessel arrived at New York she was sent to the shipyard of R. G. & J. S. Packard, where repairs were made upon her by that firm. In April, 1895, a bill for repairs amounting to $1,204.39 was forwarded by R. G. & J. S. Packard to Mr. Schermerhorn. After deducting therefrom $42.87, at the request of Mr. Schermerhorn, for the reason that Mr. Schermerhorn thought the Packards should not make any profit out of the work, the balance, being $1,161.52, was paid by Mr. Schermerhorn, who seems to have acted as treasurer for the two agents. This payment was made May 6, 1895. The Packards continued their repairs upon the vessel from April 17, 1895, down to October 26th of that year, at an additional expense of $680.36. After these repairs had been made, probably immediately after, for Mr. Packard says he thinks it was in October, 1895, the tug was taken out to sea for towing purposes. On her return, within a day or two, her crew refused to go again with her because, as they said, "she was too low in the water and did not pull strong enough for that kind of work."

On December 4, 1895, it appears that the board of directors of the Atlantic & Gulf Coast Dredge Owners' Association, of which association the 24 members of the parties of the second part to the agreement of October 12, 1892, were members, and who seem to have had conferred upon them the authority, to some extent, of managing the business of the members of the association, adopted a vote that Charles H. Souther of Boston, and Henry H. Petze of New York, and Charles W. Pusey of Wilmington, should be constituted a committee of the board to settle and dispose of the contract between the members of the association and the National Dredging Company, dated October 12, 1892, and all matters growing out of the contract. That:

"Said committee shall have power to accept delivery of, and recover and take the legal title to, and possession of, all and singular the plants and property acquired or to be acquired by or in behalf of said members of this association under said contract, and shall sell and dispose of the same as fast as they can do so reasonably and without too great sacrifice, and in the meantime to care for, protect, and preserve said property or any part thereof by leasing, repairing, and insuring the same or otherwise, all in accordance with their best judgment and discretion, and to collect and receive all proceeds and income arising therefrom, and, after deducting the payments and expenditures herein authorized, to distribute the same to and among the members of the parties of the second part to the contract above referred to, pro rata, in proportion to their respective payments or contributions under said contract."

The vote further was to the effect that the committee might require from the members of the parties of the second part to the contract of October 12, 1892, who should concur in the vote of the board of directors, assignments of their respective rights, title, and interests under said contract, with powers of attorney, for which the committee were directed to issue to the assignors, respectively, proper certificates as evidence of their interest in the trust. The vote also provided that:

"All unexhausted powers and duties heretofore conferred upon Ralph G. Packard and Louis Y. Schermerhorn, under the contract aforesaid, are hereby, with their consent, terminated, and the same are hereby conferred upon and vested in said committee and its successors, all in so far as such termination and substitution may be made by consent of parties in interest thereto, and without prejudice to such rights and interests, if any, as cannot be enforced otherwise than through or in the names of said Packard and Schermerhorn; subject to which reservations only said committee, to wit, said Souther, Petze and Pusey, and their successors in said trust hereby created, are hereby constituted and appointed, by every power this board of directors thereunto enabling, the attorneys irrevocable of this association in so far as interested and the members thereof parties to the contract aforesaid, to do all acts and things in, toward or about the accomplishment of the objects herein committed to them and to that end to employ counsel," etc.

The vote also provided that:

"This vote shall be submitted to the members of said party of the second part to the contract aforesaid, for their ratification, adoption and confirmation, and, except in behalf of such members so approving, shall not be construed as any assumption of power, authority or interest by this association, or the board of directors thereof, to represent others in the premises."

The above vote of the board of directors was ratified unconditionally by 14 of the 24 parties of the second part to the contract of October 12, 1892. The firm of R. G. & J. S. Packard, one of the 24 parties of the second part, signed the ratification conditionally, as follows:

"We concur in foregoing agreement, and agree to payment of any beyond our account against the National Dredging Company. [Signed] R. G. & J. S. Packard."

In the spring of 1896 the above-mentioned bill for repairs, made by R. G. & J. S. Packard between April 17, and October 26, 1895, and amounting to $680.36, was presented to Schermerhorn for payment and returned by him with the statement that he had no funds out of which to make payment. Schermerhorn says that he had no knowledge of these repairs having been made prior to the time when the bill was presented to him, and that he had no funds on hand with which to pay the bill, because in the fall of 1895 (we have learned that it was on December 4, 1895) new trustees (the libelants in this case) had been appointed in the place of Messrs. Packard and Schermerhorn, and that Messrs. Packard and Schermerhorn had, before the bill was presented, turned over to the new trustees all the funds they had on hand. On July 6, 1896, the proofs show that the last installment of the consideration money of $125,000 was paid by the parties of the second part to the National Dredging Company, and on July 13, 1896, the National Dredging Company executed and delivered to the libelants a bill of sale for the tug for an expressed consideration of $10,000. The bill of sale was to Charles H. Souther, Henry H. Petze, and Charles W. Pusey in their individual names. It was recorded in the custom house at New York on July 19, 1898. In the early part of 1898, and probably in the month of February, nearly two years after the bill of sale had been executed and delivered to the libelants, there was a meeting of some of the members of the board of directors of the dredge owners' association, which, as I understand the proofs, was held in Baltimore. Mr. Petze, one of the libelants,

acting as a member of the committee under the authority of the agreement of December 4, 1895, says that he had found a purchaser for the tug and had called together several of the interested parties near at hand for advice as to whether the sale should be made. Packard says that Mr. Petze reported at this meeting that he had an offer of $800 for the tug, and asked directions as to what should be done about the offer. Packard says that he advised against accepting it, and stated that he himself was willing to give $1,600 for the tug, and he declares "that the board at once passed a resolution selling the boat to me at $1,600," and that he agreed to the sale. Some time after the Baltimore meeting (Mr. Packard says in April or May of 1898) it appears that a meeting was held at 31 Pine street, New York, at which were present Mr. R. G. Packard, Mr. Petze, Mr. Loomis, and Mr. P. S. Ross, and that Mr. Petze reported at this meeting that he had an offer of $3,500 for the tug, and that he and the others desired to know whether Packard would return the tug to the association and let them take charge of the sale and get the profits resulting from such sale. Packard says he consented, on condition that they would pay his firm the money they had expended on the boat. He says that Mr. Petze expressed regret that the Packards had spent so much money on her, and then raised the question of title to the vessel, when he (Packard) declared that he would guaranty the title to the prospective purchaser, if Mr. Petze desired it. Packard says he did not have the bills for repairs with him at that time, but that he promised to send them to Mr. Petze later. Notwithstanding Mr. Packard's alleged waiver of his right to the tug made at the meeting in April or May, 1898, and his promise to send Mr. Petze the bills of the firm of R. G. & J. S. Packard for repairs, which at that time only amounted to $680.36, that firm, according to their proofs, continued to make other repairs which between May 14 and June 30, 1898, amounted to $717.46, and sent no bills to Mr. Petze until June 29 or 30, 1898, when the two bills, one for $680.36 and the other for $717.46, were sent. Indeed, all the items in the later bill, except the first three, amounting to $18, are for improvements alleged to have been made between June 17 and 30, 1898. On receipt of the bills by Mr. Petze a dispute arose concerning the delivery of the tug; Packard refusing to deliver it, and Petze insisting upon the right of the libelants to possession. No agreement being reached, the libelants had their bill of sale recorded in the custom house at New York, on July 19, 1898, the firm of R. G. & J. S. Packard continued to put other improvements on the tug between July 1st and August 6th to the amount of $150.46, and on August 5, 1898, the libel in this case was filed.

The above rather extended statement of the facts in the case shows clearly, I think, that the answer of Ralph G. Packard setting up his ownership of the tug is not supported by the proofs. At the time of the alleged sale to him, namely, in February, 1898, the alleged debt due to his firm was only $680.36. He says the sale to him was for $1,600, but he does not claim that he made any payment whatever. He never secured or applied for a bill of sale. He does not produce

any copy of the resolution of the board of directors of the dredge owners' association, by which he says the sale was made. Nor is there any proof that that board had authority to sell the tug. The legal title to the tug had been vested, by the bill of sale, in Petze, Souther, and Pusey, although the beneficial ownership was in the parties for whom they were agents or trustees. By the vote of the board on December 4, 1895, ratified by the firm of R. G. & J. S. Packard, Petze, Souther, and Pusey, and not that board, were empowered to make sales of the property purchased under the contract of October 12, 1892. Even if the board did at its meeting in February, 1898, adopt a resolution to sell the tug to Packard for $1,600, it was a nugatory act. Besides, by his letter of June 30, 1898, to Mr. Petze, Packard said that, "without some distinct understanding as to payment of bills on 'Kirkland,' I shall hold the boat or libel her." His position as a libelant against the boat, on account of bills incurred in repairing her, is inconsistent with the idea of ownership. The conclusion reached is that he has failed to establish the claim set up in his answer.

The second question relates to the claim of the firm of R. G. & J. S. Packard. That claim is that they are entitled to retain possession of the vessel because of a lien for repairs. It will be observed that the bill of $680.36 for repairs made by the firm between April 17 and October 26, 1895, was within the period that Ralph G. Packard and Louis Y. Schermerhorn were the agents or representatives of the parties of the second part mentioned in the contract of October 12, 1892. Ralph G. Packard does not claim that he ever consulted Mr. Schermerhorn concerning the need for these repairs, and Schermerhorn denies that any such consultation was ever had, or that he had any knowledge of the making of the repairs until the bill for $680.36 was sent to him in the spring of 1896. In view of the fact that after the vessel had arrived at New York the Messrs. Packard were paid the sum of $1,161.52 for repairs, it is my opinion that they should not have continued to make the other repairs between April 17 and October 26, 1895, without the consent of Schermerhorn as well as of R. G. Packard. The firm of R. G. & J. S. Packard were one of the parties of the second part who executed the agreement of October 12, 1892. They knew what powers had been given to R. G. Packard and Schermerhorn. They were therefore bound to secure from Schermerhorn, as well as from R. G. Packard, authority for the repairs. They could not have a lien upon the vessel for repairs that had not been authorized by the two agents of the parties of the second part. R. G. Packard himself admits that the delivery of the vessel to him and Schermerhorn in April, 1893, was for the use of the parties of the second part mentioned in the agreement of October 12, 1892. He therefore knew, or was bound to know, that he could not, without the consent of his co-trustee, authorize his firm to repair the tug in any such manner as to give to that firm a maritime lien upon her.

So, too, concerning the other bills for repairs amounting to $717.46 and $150.46. Ralph G. Packard does not pretend that these re-

pairs were made with the consent of Mr. Petze, Mr. Souther, or Mr. Pusey, the new agents or representatives of the parties of the second part, or even of Mr. Schermerhorn. On the contrary, he claims that these repairs were made by the firm of R. G. & J. S. Packard after he (R. G. Packard) had purchased the vessel in February, 1898. It is clear therefore that the circumstances under which the repairs from May 14 to August 6, 1898, were made could give no rise to a lien against the vessel. They were not made on the credit of the vessel. They were made on the authority of R. G. Packard, who was neither the owner of the vessel nor the agent of the owner. Nor was the vessel in such a condition as to justify such repairs without the consent of the owners or their agents. It follows that the claim to the right of possession, set up in the answer of the firm of R. G. & J. S. Packard, likewise fails for want of proper proof.

The last question is whether the libelants have shown their right to the possession of the vessel. As already stated, a bill of sale was executed to them by the National Dredging Company on July 13, 1896, within one week after the last payment to the National Dredging Company on account of the purchase price of $125,000 for its Atlantic Coast plant. Petze, Pusey, and Souther were all officers of companies who had signed the agreement of October 12, 1892, and the ratification of the vote of the board of directors of the Atlantic & Gulf Coast Dredge Owners' Association dated December 4, 1895. Petze admits that he and his associates, Souther and Pusey, acted as agents and representatives of the parties of the second part mentioned in the agreement of October 12, 1892. The title taken by them under the bill of sale was without doubt a mere legal title; beneficial ownership being in the parties of the second part mentioned in the agreement of October 12, 1892. Neither R. G. Packard nor the firm of R. G. & J. S. Packard were in a position to dispute the title of the libelants, for that firm, as already stated, signed the agreement of December 4, 1895, by which they ratified the vote of the board of directors of the dredge owners' association to the effect that:

"The said committee [that is, the libelants in this case] shall have power to accept delivery of and recover and take the legal title to and possession of all and singular the plants and property, acquired or to be acquired, by or in behalf of said members of this association under said contract."

The condition annexed to their signature did not affect the provision above quoted. The libelants therefore were expressly authorized by the contract of December 4, 1895, to take the legal title to the Kirkland, and they may assert that title as against any claim set up either by Ralph G. Packard or by R. G. & J. S. Packard.

The prayer of the libel will be granted, and a decree will be entered directing the steam tug Robert R. Kirkland to be delivered to the libelants, and that the respondents Ralph G. Packard and R. G. & J. S. Packard be required to pay costs.